2005 OK CIV APP 27

**Betty Schack PARDEE,
Plaintiff/Appellant,**

v.

**PERSONAL REPRESENTATIVE FOR the ESTATE OF Douglas Debaun PARDEE, Deceased, and Mary Frances Pardee, Defendants/Appellees.**

No. 98,947.

Court of Civil Appeals of Oklahoma,
Division No. 2.

Aug. 31, 2004.

Rehearing Denied Jan. 31, 2005.

Gary L. Watts, Gretchen M. Schilling, Riggs, Abney, Neal, Turpen, Orbison & Lewis, Tulsa, OK, for Plaintiff/Appellant.

Ted L. Moore, Broken Arrow, OK, for Defendants/Appellees.

Opinion by KEITH RAPP, Judge:

¶ 1 Trial court plaintiff, Betty Schack Pardee, (Plaintiff) appeals the trial court's Order sustaining the summary judgment motion of defendant, Mary Frances Pardee, as personal representative of the Estate of Douglas DeBaun Pardee, and individually, (Defendants) and denying her motion for summary judgment in this breach of contract and constructive trust action. This appeal was assigned to the accelerated docket pursuant to Okla. Sup.Ct. R. 1.36, 12 O.S.2001, ch. 15, app.

## BACKGROUND

¶ 2 Plaintiff was married to Douglas DeBaun Pardee, (Pardee) now deceased, in 1968. They divorced on December 6, 1991, pursuant to a Final Decree filed in the Circuit Court of Roanoke County, Virginia. Their Final Decree incorporated a Post-Nuptial Agreement, dated October 2, 1991, (Agreement) wherein Plaintiff and Pardee resolved all matters involving their property rights. The Agreement provided, in part, that Plaintiff was entitled to one-half of Pardee's annuity or retirement plans with his employer, Blue Circle Cement Company, and with Lone Star Company. The Agreement specifically stated:

    8. *INTANGIBLE PERSONAL PROPERTY:*

    A. The husband agrees that the wife shall be entitled to one-half of his annuity or retirement plans with Lone Star Company and with Blue Circle Company. Both of these plans make provisions for retirement payments to the husband at the time he reaches the age of 65. The husband agrees to execute any and all docu-

ments necessary to insure that the wife obtains a one-half interest in said plans and receives at the time said funds are distributable to the husband one-half of such payments as may be made to the husband thereunder.

. . . .

19. *FUTURE COMPLIANCE:* Each party does hereby agree that he or she will execute any and all documents necessary to carry forth the intent, express or implied, of this agreement and shall do so in a rapid and timely manner upon request by the other party.

20. *GOVERNING LAW:* This agreement shall be construed and governed in accordance with the laws of the Commonwealth of Virginia.

¶ 3 Pardee moved to Oklahoma and later married the defendant, Mary Frances Pardee, on December 21, 1991. Pardee and Defendant were married until the time of his death on July 28, 2000.

¶ 4 Pardee began working with Blue Circle Cement on October 15, 1984. He elected early retirement from Blue Circle Cement and retired on July 15, 2000. At the time of his retirement, he was a participant in the Blue Circle Cement Retirement Plan which was administered under the provisions of the *Employee Retirement Income Security Act of 1974,* 29 U.S.C. § 1001 et seq. (*ERISA* ) as amended by the *Retirement Equity Act of 1984* (*REA* ). Upon retiring, Pardee elected, with Defendant's requisite consent, the "lump sum payment" rather than the "qualified joint and survivor annuity" under the Blue Circle Cement Retirement Plan.[1] The Plan Administrator paid Pardee the lump sum payment of $189,397.41 on July 27, 2000. The distribution was made to an Individual Retirement Account (I.R.A.) in Pardee's name, with Defendant named as the beneficiary. Pardee did not pay Plaintiff any of the proceeds from the retirement account or

the I.R.A. Pardee died from brain cancer on July 28, 2000.

¶ 5 Upon Pardee's death, Defendant collected the retirement funds from Pardee's I.R.A. and moved the funds into an account in her name.

¶ 6 According to Plaintiff, she made a claim for one-half of the retirement funds with Blue Circle Cement, which it denied. Plaintiff then made a demand upon Defendant for payment of these funds, which Defendant declined to do. Plaintiff therefore filed this litigation in an attempt to recover one-half of Pardee's retirement funds from either Defendant and/or Pardee's estate.[2] Plaintiff alleged in her Petition that Pardee breached their Agreement by withdrawing the retirement funds and failing to deliver one-half of the funds to her. She also alleged certain assets, including the retirement fund proceeds, were transferred to Defendant prior to and after the death of Pardee, that such transfers by Pardee or at his direction were a breach of the Agreement, and the trial court should determine Plaintiff has a constructive trust in these assets.

¶ 7 In her Answer, Defendant denied any breach of the Agreement and also argued Plaintiff failed to perfect her interest in the retirement funds because she did not request that Pardee execute a Qualified Domestic Relations Order (QDRO) or "any and all documents necessary to insure that the wife obtains a one-half interest" in the retirement funds pursuant to the Agreement.

¶ 8 Defendant subsequently filed a summary judgment motion arguing there were no material facts in issue and the trial court should grant summary judgment as a matter of law. Defendant argued the preemption and anti-alienation provisions of ERISA, as amended by the REA, precluded Plaintiff from recovery on her breach of contract action. Defendant also argued Plaintiff's failure to file a QDRO with the Virginia court prevented her from now seeking one-half of

---

**1.** Title 29 U.S.C. § 1055(c)(2)(A)(1999) provides that a participant may not waive the qualified joint and survivor annuity form of benefit unless the participant's spouse consents in writing to such election.

**2.** Plaintiff also alleged Pardee failed to pay educational expenses for their children that he was obligated to pay and asked for reimbursement of these costs. However, she dismissed this cause of action without prejudice and it is not at issue in this appeal.

the retirement funds pursuant to the Agreement. Furthermore, Defendant argued Defendant's beneficiary interest in the funds held by the plan administrator vested on the date of Pardee's retirement.

¶ 9 In her response to Defendant's summary judgment motion, Plaintiff alleged there were material issues of fact in dispute and Defendant was not entitled to summary judgment as a matter of law. Plaintiff's primary argument was that the retirement plan funds were no longer subject to ERISA protection once the funds were removed from the plan.

¶ 10 Plaintiff filed a motion for summary judgment on January 9, 2003, arguing she was entitled to judgment as a matter of law. Plaintiff argued that once the "funds are removed from a retirement plan that has anti-alienation provisions and is subject to federal preemption of state law, the funds are no longer subject to such provisions or federal preemption." In her second proposition, Plaintiff argued she was entitled to a constructive trust in one-half of the retirement funds held by Defendant.

¶ 11 The trial court entered an order, filed March 31, 2003, sustaining Defendant's motion for summary judgment and denying Plaintiff's motion for summary judgment. The trial court specifically found:

4. That Title 29 U.S.C. § 1056(d) specifically restricts the alienation of "pension plan benefits", but does not mention "welfare plan benefits", whereas, Title 29 U.S.C. § 1144, employs an expanded scope of preemption, stating that ERISA provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any *employee benefit plan*", encompassing both "pension plans" and "benefit plans".

5. That, for any employee benefit plan governed by ERISA, the only permitted exception to alienation permitting a former spouse to secure an interest in plan benefits, whether pension or welfare, is by use of the Qualified Domestic Relations Order (QDRO), pursuant to 29 U.S.C. §§ 1056(d)(3) and 1144(b)(7), allowing the former spouse to be designated as an "alternate payee" *with respect to the Participant.*

. . . .

7. That the former spouse (Plaintiff), though previously represented by counsel, wholly failed or neglected to "perfect" her interest in, and with respect to the Participant's interest, in the Blue Circle Retirement Plan as Alternate Payee pursuant to the explicit requirements of Title 29 U.S.C. § 1056(d)(3).

8. That, under the laws of the Fourth Circuit Court of Appeals within and for the State of Virginia, as set forth in *Hopkins v. AT & T Global Information Solutions Company,* 105 F.3d 153 (4th Cir.1997), the surviving spouse's interest in the Participant's retirement plan irrevocably vested in the surviving spouse on the date of the Decedent's retirement, or, in this case, July 15, 2000.

. . . .

11. That the Plaintiff's attempt to establish a constructive trust over those funds now vested in the Surviving Spouse, after payment by the plan fiduciary, would create a diversion of retirement benefits that would be improperly sanctioned by "state law" contrary to the dictates of *Boggs v. Boggs,* 520 U.S. 833, 117 S.Ct. 1754 (1996), contrary to the case law applicable to the State of Virginia, *Metropolitan Life Insurance Company v. Pettit,* 164 F.3d 857 (4th Cir., 1998), and contrary to the statutory provisions of ERISA which expressly gave the Plaintiff her sole remedy, and would obstruct the accomplishment of the goals of ERISA rendering the requirement for adherence to those statutes meaningless.

12. That a constructive trust imposed on a plan beneficiary arising from and premised upon a domestic relations agreement, for funds paid by the plan fiduciary, according to the *Pettit* case, directly "relates to" and affects the distribution of plan benefits of the Blue Circle Cement Employee Benefit Plan, more particularly its even more restricted salaried "Employee Pension Plan", and would constitute a prohibited alternative enforcement mechanism.

13. That the Plaintiff's claim under the settlement agreement is an alternative enforcement mechanism that impacts the relationship of the traditional parties and is exactly the situation Congress sought to avoid by the enactment of ERISA.

Plaintiff appeals.

## STANDARD OF REVIEW

¶ 12 Disposition of a case by summary judgment is reviewed by this Court by a *de novo* review. *Pickens v. Tulsa Metropolitan Ministry*, 1997 OK 152, ¶ 7, 951 P.2d 1079, 1082. "[A]n appellate court claims for itself plenary independent and non-deferential authority to reexamine a trial court's legal rulings." *Kluver v. Weatherford Hosp. Auth.*, 1993 OK 85, ¶ 14, 859 P.2d 1081, 1084. "Summary judgment should be granted where facts set forth in detail in affidavits, depositions, admissions on file, and other competent extraneous materials show there is no substantial controversy as to any material fact." *Weeks v. Wedgewood Village, Inc.*, 1976 OK 72, ¶ 12, 554 P.2d 780, 784. All facts and inferences must be viewed by this Court in the light most favorable to the non-movant. *Pickens*, 1997 OK 152 at ¶ 7, 951 P.2d at 1082. One who defends against a claim and who does not bear the burden of proof is not required to negate the plaintiff's claims or theories in order to prevail on a motion for summary judgment. When a defendant moves for summary judgment without relying upon an affirmative defense, the defendant must show that no substantial factual controversy exists as to at least one fact essential to plaintiff's theory of the cause of action and the fact is in defendant's favor. Once a defendant has introduced evidentiary materials to establish these elements, the plaintiff then has the burden of showing that evidence is available which justifies a trial of the issue. *Akin v. Missouri Pac. R.R. Co.*, 1998 OK 102, ¶¶ 8, 9, 977 P.2d 1040, 1044.

## ANALYSIS

¶ 13 Plaintiff argues on appeal that the trial court erred, as a matter of law, in finding Defendant was entitled to summary judgment. Plaintiff argues that the pension plan funds were not entitled to ERISA protection via the preemption statute or the anti-alienation provision once the funds were distributed by the plan administrator to Pardee. Plaintiff also contends the trial court erred in finding, as a matter of law, she was not entitled to a constructive trust in the pension plan funds held by Defendant.

¶ 14 Congress enacted ERISA to "protect the welfare of employees and their dependents who depend upon retirement plans." *Hawxhurst v. Hawxhurst*, 318 N.J.Super. 72, 723 A.2d 58, 63 (1998). "The statute is remedial in nature and was enacted to encourage the creation and growth of private pensions plans while at the same time protecting the participants of those plans." *Id.* As part of ERISA, Congress enacted two provisions to safeguard its intent to secure the rights and expectations created by ERISA. The first provision is the "preemption clause which establishes the regulation of pension plans 'as exclusively a federal concern.'" *Id.* The preemption clause provides:

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144 (1999). "By using the phrase 'relate to' instead of more limited preemption language, Congress meant to include state laws with a 'connection with or reference to' an employee benefits plan." *Hawxhurst*, 723 A.2d at 63. Generally, ERISA preempts all state statutes relating to employee benefits plans. *Id.*

¶ 15 The second safeguard ERISA provides is the spendthrift provision, also known as the anti-alienation provision. The anti-alienation provision mandates that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1)(1999). The anti-alienation provision is mandatory and provides only two exceptions, including one for a QDRO. *Hawxhurst*, 723 A.2d at 64.

A QDRO is a type of domestic relations order "which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." 29 U.S.C. § 1056(d)(3)(B)(1999).

¶ 16 In the present case, the trial court found, as a matter of law, that Plaintiff had not perfected her interest in the pension plan funds because she had failed to file a QDRO to protect her interest and therefore did not fall within an exception to the ERISA anti-alienation provision. The trial court further found that to allow Plaintiff to establish a constructive trust over those funds "would create a diversion of retirement benefits that would be improperly sanctioned by 'state law' contrary to the dictates of *Boggs v. Boggs*, 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997), contrary to the case law applicable to the State of Virginia, *Metropolitan Life Insurance Company v. Pettit*, 164 F.3d 857 (4th Cir., 1998), and contrary to the statutory provisions of ERISA which expressly gave the Plaintiff her sole remedy." The trial court ultimately held that Plaintiff's action was exactly the type of action Congress intended to avoid by enacting ERISA.

¶ 17 Although the trial court's order is well-reasoned, this Court finds the cases relied on by the trial court distinguishable.

¶ 18 In *Boggs*, the United States Supreme Court addressed the issue of whether ERISA preempts a state community property law allowing a nonparticipant spouse to transfer by testamentary instrument an interest in undistributed pension plan benefits. *Boggs*, 520 U.S. at 835–36, 117 S.Ct. at 1758. The respondents in *Boggs* were the children of the plan participant and his first wife. Upon her death, the first wife bequeathed her community property interest in the plan participant's undistributed pension plan funds to their sons. The plan participant's second wife sought a declaratory judgment that ERISA preempted the application of state community property and succession laws to the extent they recognized the first wife's children's claim to an interest in the disputed retirement benefits.

¶ 19 In reaching this issue, the Supreme Court noted the purpose of the ERISA provisions—"[t]he principal object of the statute is to protect plan participants and beneficiaries ... and defraying reasonable expenses of administering the plan." *Boggs*, 520 U.S. at 845–46, 117 S.Ct. at 1762–63. The Court noted that Congress specifically chose to limit beneficiary status on a nonparticipant spouse or dependent in only narrow circumstances set forth in its provisions. *Boggs*, 520 U.S. at 847, 117 S.Ct. at 1763. One example noted by the Court is the Section 1056's QDRO provisions, which "recognize certain pension plan community property interests of nonparticipant spouses and dependents." *Id.* at 846, 117 S.Ct. at 1763. As to the undistributed pension benefits, the Supreme Court noted the testamentary transfer would be a prohibited "assignment or alienation" under the Section 1056(d)(1) anti-alienation clause. *Boggs*, 520 U.S. at 851, 117 S.Ct. at 1765. The Court concluded that it would be contrary to ERISA's purposes "to permit testamentary recipients to acquire a competing interest in undistributed pension benefits, which are intended to provide a stream of income to participants and their beneficiaries." *Boggs*, 520 U.S. at 852, 117 S.Ct. at 1766.

¶ 20 The facts in *Boggs* are distinguishable from those presented here. In *Boggs*, the facts involved *pre-distribution* funds still in the control of the plan administrator, as opposed to the present case where the pension plan funds were *distributed* to Pardee and were no longer in the hands of the plan administrator. The Supreme Court in *Boggs* emphasized this distinction by stating that "this case does not present the question whether ERISA would permit a nonparticipant spouse to obtain a devisable community property interest in benefits paid out during the existence of the community between the participant and that spouse." *Boggs*, 520 U.S. at 845, 117 S.Ct. at 1762. A pre-distribution fund situation such as in *Boggs* satisfies the purposes of ERISA—to protect the participant and defray the cost of administering the plan. Here, the funds have been distributed and the successful administration of the funds is not a concern. As *Boggs* involved pre-distribution funds as opposed to distributed funds, as in the present case, this

Court finds *Boggs* distinguishable and, here, inapplicable. Thus, this Court finds the trial court erred in relying on *Boggs*.

¶ 21 The trial court also relied on *Metropolitan Life Ins. Co. v. Pettit*, 164 F.3d 857 (4th Cir.1998), in finding that Plaintiff's action was preempted. However, this Court also finds *Pettit* distinguishable from the present case. In *Pettit*, the insured's widow and his ex-wife each claimed an interest in the insured's insurance proceeds due under an ERISA-qualified plan. The ex-wife's claim in the proceeds was based on a property settlement agreement she entered into with the insured upon their divorce. The ex-wife asked the court to establish a constructive trust in the funds. The court framed the issue as "whether ERISA preempts the enforcement of a property settlement agreement against life insurance benefits paid through an ERISA-governed plan." *Pettit*, 164 F.3d at 860. The Fourth Circuit found the ex-wife's claim to establish a constructive trust was preempted because it interfered with the congressional goals of ERISA. *Id.* at 864. The court also noted that the ex-wife had not filed a QDRO, the method Congress provided for a former spouse to secure an interest in plan benefits. *Id.* The court noted that to find otherwise would "[lead] to unpredictability, whereas a QDRO, which must be filed with a plan administrator, provides notice and predictability for the plan administrator, participants, and beneficiaries." *Id.* at 863. The court stressed that the "constructive trust claim, which is based upon a property settlement agreement, if allowed to stand, would directly conflict with ERISA's goal of providing a nationally uniform plan administration and reduce the QDRO provisions to a meaningless footnote in the preemption context." *Id.* at 864. Thus, the court held that her claim for a constructive trust of funds still in the administrator's control based on the property settlement agreement was preempted.

¶ 22 As in *Boggs*, the *Pettit* court was faced with a situation involving *pre-distribution* funds. The funds in *Pettit* were still in the hands of the plan administrator, who was looking for guidance from the courts on how to distribute the funds. Here, the funds have already been distributed and the goals of Congress are not being compromised.

¶ 23 The court in *Hawxhurst v. Hawxhurst*, 318 N.J.Super. 72, 723 A.2d 58 (1998), was faced with an issue similar to that presented by the current litigation. The husband entered into a prenuptial agreement with his wife. Prior to his divorce, the husband accepted an early retirement package from his employer, which included a lump sum distribution of his ERISA-qualified pension plan. *Id.* at 63. The husband rolled the plan funds into an Independent Retirement Account in his name. Upon his divorce, the husband argued the terms of the prenuptial agreement were preempted by the spendthrift provision of ERISA. *Id.* at 62. After a thorough discussion of the applicable ERISA provisions and the purpose of Congress in enacting ERISA, the court concluded that "established authority in analogous situations supports the conclusion that once distributed, the ERISA anti-alienation provision does not shelter this asset." *Hawxhurst*, 723 A.2d at 65. The court found that once the funds were distributed, "the parties could confer rights in the fund created by distribution as they saw fit." *Id.* at 65. "Once distributed, an asset was created which not only became subject to the terms of the pre-nuptial agreement but also was beyond the anti-alienation protections of ERISA." *Id.* at 66. This Court finds *Hawxhurst* instructive in the present case.

¶ 24 The prevailing view is that ERISA does not protect pension funds after the beneficiary receives the funds. Other courts, including the Tenth Circuit, have followed this reasoning in different factual contexts. In *NCNB Fin. Serv., Inc. v. Shumate*, 829 F.Supp. 178 (W.D.Va.1993), the district court held the ERISA prohibition against alienation did not protect funds which had been received by the retiree. The retiree argued certain funds in his bank account that were traceable to his pension plan funds were protected from attachment under the ERISA anti-alienation provision and therefore he filed a motion to quash a notice of lien on his bank account. The court noted, relying on a Supreme Court decision in *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988), that the ERISA anti-alienation provision "bars the assignment or

alienation of pension plan benefits, and thus prohibits the use of state enforcement mechanisms only insofar as they prevent those benefits from being paid to plan participants." *Shumate*, 829 F.Supp. at 180. The court emphasized that "once the line of actual receipt is crossed ... ERISA no longer protects funds despite their origination in an ERISA-qualified pension plan." *Id.* at 180. Thus, the Federal district court found ERISA no longer protected the pension plan funds once they were distributed to the retiree and denied his motion to quash the lien on his bank account containing the funds.

¶ 25 In *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 39 F.3d 1078 (10th Cir. 1994), the court concluded that the anti-alienation provision of ERISA "did not extend to protect private pension benefits once paid to and received by the beneficiary." *Id.* at 1081. In reaching this conclusion, the Tenth Circuit went through a comprehensive analysis of the ERISA anti-alienation provisions, the sparse legislative history, and applicable administrative regulations. The court noted that the anti-alienation provision "focuses on benefits, but is silent on whether the term is meant to include benefits in the nature of distributed funds no longer within the fund and held by the plan participant or beneficiary." *Id.* at 1082 (citation omitted). Finding legislative history inconclusive on the issue, the court then deferred to agency regulations for guidance.

> Treasury regulations define "assignment" and "alienation" as "[a]ny direct or indirect arrangement (whether revocation or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary." 26 C.F.R. § 1.401(a)–13(c)(1)(ii) (1992) (emphasis added). While the regulation does not define "benefits," it resolves our issue from another direction. The terms "alienation" and "assignment" are meant only to cover those arrangements that *generate a right enforceable against a plan. Therefore, "benefits" are protected by the anti-alienation provision of [the anti-alienation clause] only so long as they are within the fiduciary responsibility of private plan*

> *managers. Following distribution of benefits to the plan participant or beneficiary, a creditor no longer has a right against the plan.* Instead, the creditor must collect directly from the participant or beneficiary or, as here, initiate an enforceable garnishment procedure against a third-party bank who holds the funds paid to the participant or beneficiary.

*Id.* at 1082–83 (emphasis added). The Tenth Circuit also noted that Congress had drafted other income protection statutes to include language protecting benefits that had been distributed from the pension plan, but had not included such language in the ERISA anti-alienation section. *Id.* at 1083. The Tenth Circuit therefore concluded that ERISA Section 206(d)(1) [the anti-alienation provision] protects ERISA-qualified pension benefits from garnishment only until paid to and received by plan participants or beneficiaries.

¶ 26 The Supreme Court of Michigan, in *State Treasurer v. Abbott*, 468 Mich. 143, 660 N.W.2d 714, 723 (2003), held ERISA does not protect pension funds once the funds are deposited in an inmate's prison account. The Michigan court followed the holding in *Guidry* that ERISA does not provide protection of pension funds once the funds are distributed to the beneficiary, which in *Abbott* was an inmate. The Michigan court stated:

> We also prefer the approach adopted by the overwhelming majority of federal courts. Once pension funds are deposited in an inmate's account, ERISA does not protect them. We agree with the *Guidry II* court that the text of subsection 206(d)(1) does not address whether benefits that the pensioner has already received are protected. The statute's silence on this issue requires deference to the reasonable interpretation set forth in the Treasury Department regulation. That regulation clarifies that the statute protects against the alienation or assignment of rights *against the plan itself.* Other statutory schemes, including the Social Security Act, clearly protect benefits after their receipt. Congress did not include such expansive language in ERISA.

*Id.* at 723 (citations omitted).

¶ 27 Based on this rationale, this Court finds that the pension plan funds were no

longer entitled to ERISA protection once the plan funds were distributed to Pardee. Thus, the trial court erred in sustaining Defendant's motion for summary judgment and in denying Plaintiff's motion for summary judgment on the ERISA issue. This issue is reversed and remanded to the trial court with instructions to enter an order sustaining Plaintiff's summary judgment motion and denying Defendant's summary judgment motion on the ERISA issue.

¶ 28 This Court is next presented with the issue of whether the trial court erred in determining as a matter of law that Plaintiff was not entitled to a constructive trust over the pension plan funds currently held by Defendant.

¶ 29 The court will generally impose a constructive trust to avoid unjust enrichment. *Cacy v. Cacy,* 1980 OK 138, ¶ 7, 619 P.2d 200, 202. A constructive trust is defined as follows:

> [A constructive trust] is imposed against one who by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

*Id.* A "[c]onstructive trust assumes that one party ... has title to certain property ... that another ... has a better right to." *In re Bruner,* 1993 OK CIV APP 109, ¶ 12, 864 P.2d 1289, 1292.

¶ 30 After a review of the record before this Court, this Court finds there are material issues of fact on the issue of whether the trial court should impose a constructive trust on the funds for the benefit of Plaintiff that preclude summary judgment. This Court finds that neither party was entitled to summary judgment on this issue as there are material issues of fact that prevent summary judgment. The trial court Order sustaining Defendant's summary judgment motion and denying Plaintiff's summary judgment motion on the constructive trust issue is reversed and remanded to the trial court for further proceedings consistent with this Opinion.

## CONCLUSION

¶ 31 This Court finds the trial court erred in sustaining Defendant's motion for summary judgment and in denying Plaintiff's motion for summary judgment on the issue of whether the retirement funds were entitled to ERISA protection once the funds were distributed by the plan administrator to Pardee. This issue is reversed and remanded to the trial court with instructions to enter an order sustaining Plaintiff's summary judgment motion and denying Defendant's summary judgment motion on the ERISA issue. This Court further finds the trial court erred in sustaining Defendant's summary judgment motion and denying Plaintiff's summary judgment motion on the constructive trust issue as there are material issues of fact that preclude summary judgment for either party. This matter is reversed and remanded with instructions to conduct further proceedings consistent with this Opinion.

¶ 32 REVERSED AND REMANDED WITH INSTRUCTIONS.

COLBERT, C.J., and REIF, P.J., concur.